# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MARTEACE GEORGE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-S-980-NE** |
| | ) | |
| **CITY OF HUNTSVILLE, d/b/a** | ) | |
| **HUNTSVILLE UTILITIES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Marteace George filed this action because she was not selected to interview for the position of Operations Superintendent at Huntsville Utilities.[1] George alleges that she was the most qualified candidate for the position, but was intentionally overlooked because she is black and female.[2]  Huntsville Utilities denies these allegations, and has moved for the entry of summary judgment in its favor.[3]  For the reasons set forth below, the motion will be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions,

---

[1] Doc. no. 1 (Complaint).

[2] *Id*. at ¶ 1.

[3] Doc. no. 10 (Defendant's Motion for Summary Judgment).

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis supplied).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman*

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-

moving party are not unqualified, however.  "[A]n inference is not reasonable if it is

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is material to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party

for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921).  *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF RELEVANT FACTS

Marteace George earned a Bachelor's degree in Civil Engineering from the University of Tennessee in December of 1993, and she has been employed by Huntsville Utilities since February of 1995.[4]  George works in defendant's Natural Gas Department, which is subdivided into at least two, but arguably three, divisions: the Engineering Division; the Operations Division; and, according to George, the Load Control Section.[5]  The Engineering Division is charged with designing natural gas distribution systems for industrial, commercial, and residential customers of Huntsville Utilities.[6]  Additionally, Engineering Division employees ensure cathodic protection of the natural gas system, and prepare work orders for new customer

---

[4] Doc. no. 11 (Defendant's Brief in Support of Summary Judgment), Statement of Undisputed Facts, ¶¶ 2, 4.

[5] *See id*. at ¶ 5; doc. no. 22 (Plaintiff's Brief in Opposition to Summary Judgment), Response to Defendant's Statement of Undisputed Facts, ¶ 5.

[6] Doc. no. 11, Statement of Undisputed Facts, ¶ 7.

service requests, highway relocations, main extensions, and cast iron replacements.[7] The mission of the Operations Division, on the other hand, is to construct and install the designs developed by the Engineering Division.[8] The Operations Division also maintains the physical integrity of the natural gas pipelines, and repairs problems within those pipelines.[9] The Engineering Division currently has a staff of eight employees, whereas sixty-eight people are work in the Operations Division.

George was initially hired as an "Engineer I" in the Engineering Section of the Gas Department.[10] Engineer I is an entry-level position, and incumbents lack supervisory authority.[11] George's duties included annually updating the Gas Department's Emergency Procedures Manual and the Operating and Maintenance Procedure Manual, preparing work orders, performing project feasibility proposals, and furnishing technical advice to engineering assistants, aides, inspectors, and draftsmen.[12] George also took a seat on the Gas Department's Safety Committee while holding the title Engineer I, eventually serving as Vice-Chair of the

---

[7] *Id*. at ¶ 8. "Cathodic protection" is simply prevention of pipe corrosion. *See* Deposition of Marteace George ("George Depo."), p. 193, lines 14-23.

[8] Doc. no. 11, Statement of Undisputed Facts, ¶ 44.

[9] *Id*.

[10] *Id*. at ¶ 4.

[11] *Id*. at ¶¶ 9-10. *See also* George Depo., p. 33, lines 17-21.

[12] Doc. no. 11, Statement of Undisputed Facts, ¶¶ 9, 11; doc. no. 22, Response to Defendant's Statement of Undisputed Facts, ¶ 9.

Committee.[13]

In June 1998, George laterally transferred from an Engineer I classification to a position known as "Load Controller."  She continues to perform Load Controller duties to this date, even though her title was changed in September 2000 to reflect a promotion to "Engineer II."[14]  As alluded to above, George contends that the Load Controller is properly classified as a member of a larger Load Control Section that allegedly "deals consistently with both the Engineering Division and the Operations Division,"[15] but Huntsville Utilities argues that it is merely a discrete post within the Engineering Division.   Either way, the Load Controller physically sits in the

---

[13] Doc. no. 11, Statement of Undisputed Facts, ¶ 13; doc. no. 22, Response to Defendant's Statement of Undisputed Facts, ¶ 13.

[14] Doc. no. 11, Statement of Undisputed Facts, ¶¶ 16, 31; doc. no. 22, Response to Defendant's Statement of Undisputed Facts, ¶¶ 16, 31.  After testifying in her deposition that "[p]retty much not anything" about her responsibilities changed when she was promoted from Load Controller to Engineer II, George Depo., p. 82, lines 2-11, George submitted an affidavit in which she claimed that she took on several additional duties when she was promoted — including answering phones, assisting customers with engineering questions, and informing customers of operational procedures for arranging natural gas service. *See* Affidavit of Marteace George ("George Aff."), ¶ 23.  Huntsville Utilities contends this affidavit is due to be stricken because it contradicts, without any explanation, earlier deposition testimony. *See* doc. no. 23 (Defendant's Reply Brief in Support of Summary Judgment), Reply to Defendant's Statement of Facts, ¶ 31 (citing *Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).  The court is inclined to side with Huntsville Utilities on this point. *See, e.g.*, *Van T. Junkins*, 736 F.2d at 657.  Moreover, it is worth nothing that — even accepting plaintiff's supplemental testimony as true — it is not a material addition to the record.  That is, the fact (if it be a fact) that George performed these additional duties does not significantly bolster her qualifications for the job opening that is made the subject of this lawsuit.  Accordingly, the court will disregard this portion of George's affidavit.

[15] George Aff., ¶ 11.  For instance, George is "involved with the field work maintenance of turbine meters" and other gas flow monitors. *Id*. at ¶ 24. *See also id*. at ¶ 22.

Engineering Division, and is responsible for monitoring on a daily basis the operation of the natural gas-control-computer system through a software program called "SCADA."[16]

Specifically, the Load Controller creates daily "flow reports": documents that compare the volume of natural gas consumed by customers of Huntsville Utilities to the volume received by the utilities from its suppliers.[17] The Load Controller also drafts daily "nomination reports": *i.e.*, estimates of the volume of natural gas that will be needed to satisfy demand the following day, based on weather conditions and historical trends.[18] The estimate contained within the daily nomination report is used as a guide in purchasing natural gas from suppliers. In the event the daily estimate, or "load forecast," proves to be incorrect, the Load Controller must issue an "intraday nomination change," notifying the employees in the natural gas purchasing department that more or less natural gas will be needed.[19] At the end of each month, the Load Controller drafts a report disclosing the volume of natural gas utilized by Huntsville Utilities during the previous four weeks, as well as the number of intraday

---

[16] "SCADA" is an acronym for "Supervisory Control And Data Acquisition." George Depo., p. 46, lines 11-14. *See also* doc. no. 11, Statement of Undisputed Facts, ¶ 17; doc. no. 22, Response to Defendant's Statement of Undisputed Facts, ¶ 16. To perform this job, George spends the majority of her time at her desk. *See* doc. no. 11, Statement of Undisputed Facts, ¶ 27.

[17] Doc. no. 11, Statement of Undisputed Facts, ¶ 18.

[18] *Id*.

[19] *Id*.

nomination changes that were made throughout that same period.[20]

Because natural gas demand does not cease when the standard work day ends, someone must monitor the SCADA system twenty-four hours a day, seven days a week. Therefore, during nights and on weekends, George and three other employees alternate shifts monitoring the natural gas flow and pressure at their SCADA-enabled home computers.[21] Even when she is not on duty, however, George apparently takes it upon herself to closely monitor the system.[22] Her dedication in this regard has earned her special praise in performance evaluations.[23] In fact, year after year George has been rated "excellent" or "outstanding" in nearly every graded performance category, ranging from leadership to job knowledge, from quality to quantity, and from safety to communications.[24] She has thrice been described as "an asset to the

---

[20] *Id.*

[21] *Id.* at ¶ 19.

[22] *Id.* at ¶ 25; doc. no. 22, Response to Defendant's Statement of Undisputed Facts, ¶ 25; George Aff., ¶ 20.

[23] *See*, *e.g.*, doc. no. 18 (Plaintiff's Evidentiary Materials in Opposition to Summary Judgment), Ex. 2 (2004 Performance Evaluation) ("Marteace makes good decisions. She monitors the system daily, even after hours when she is not officially on duty. . . . During this appraisal period, she phoned in the daily nomination requirement to the gas buyer while she was off."); *id.* at Ex. 3 (2003 Performance Evaluation) ("She frequently monitors the SCADA system during nights and weekends at home even when she is not on regular call duty.").

[24] *See id.* at Ex. 2; *id.* at Ex. 3, *id.* at Ex. 4 (1996 Performance Evaluation); *id.* at Ex. 5 (1997 Performance Evaluation); *id.* at Ex. 6 (1998 Performance Evaluation); *id.* at Ex. 7 (1999 Performance Evaluation); *id.* at Ex. 8 (2000 Performance Evaluation); *id.* at Ex. 9 (2001 Performance Evaluation). *See also generally* doc. no. 22, Statement of Undisputed Facts, ¶ 10.

gas department,"[25] and her supervisors have recognized her "excellent grasp of total gas supply function[s],"[26] and "complete working knowledge of gas department policies."[27]

With this record of achievement as an Engineer and Load Controller under her belt, George decided she "would like to pursue other avenues."[28] Consequently, when Huntsville Utilities posted a vacancy announcement for the position of Operations Superintendent on July 26, 2004, George promptly submitted an application.[29]

Moving from Engineer II / Load Controller to Operations Superintendent would be, in many ways, a major transition. For one thing, the positions are located in different divisions of the Natural Gas Department, and even in different buildings.[30] George has spent her entire tenure at Huntsville Utilities working in the downtown Huntsville corporate office with the Engineering Division and/or Load Control Section.[31] The Operations Superintendent, on the other hand, is the highest-ranking official in the Operations Division, which carries out a distinct mission and

---

[25] Doc. no. 18, Ex. 3; *id*. at Ex. 8; *id*. at Ex. 9.

[26] *Id*. at Ex. 8 (capitalization eliminated).

[27] *Id*. at Ex. 6 (capitalization eliminated).

[28] George Depo., p. 90, lines 21-22.

[29] Doc. no. 11, Statement of Undisputed Facts, ¶¶ 40, 49.

[30] *Id*. at ¶¶ 5, 27, 43, 46.

[31] *Id*. at ¶ 47.

-8-

is located in a separate building on Triana Boulevard in southwest Huntsville.[32]  What is more, the Operations Superintendent exercises supervisory authority over all sixty-eight employees of the Operations Division,[33] whereas George has never had authority to hire or fire employees, to recommend raises for employees, or to issue reprimands or performance appraisals.[34]

Nevertheless, there is some evidence suggesting that the move would not result in total confusion or culture shock.  The Load Controller and the Operations Superintendent report directly to Jimmie Butler, Manager of the Natural Gas Department.[35]  Additionally, the previous Operations Superintendent — who retired in 1998, leaving the position vacant for a number of years — ascended to that post directly from the Load Controller position.[36]  (In fairness to Huntsville Utilities, however, it must be noted that prior to becoming Load Controller, the previous Operations Superintendent spent around six years working in a supervisory role within the Engineering Division, and also working in the field with Operations

---

[32] *Id*. at ¶¶ 7, 43, 44, 46.

[33] *Id*. at ¶¶ 43, 45.  *See also* Deposition of Jimmie Butler ("Butler Depo."), p. 39, lines 19-22 (indicating that the Operations Superintendent is charged with evaluating certain lower-ranking employees); Deposition of Gail Weber ("Weber Depo."), p. 18, lines 17-23 (noting that the Operations Superintendent "indirectly" supervises "all of the operations section").

[34] Doc. no. 11, Statement of Undisputed Facts, ¶¶ 10, 22, 23, 33.

[35] *Id*. at ¶¶ 32, 43.

[36] *Id*. at ¶ 41.  *See also* Weber Depo., p. 21, lines 5-15.

Division employees.[37])

Aside from George, eight other employees of Huntsville Utilities formally asked to be considered for the vacancy.[38]  Only one of those eight, Vanessa Akins, is black.[39] Akins served as Secretary to Jimmie Butler, the Gas Department Manager.[40] Two of the applicants — David Prichett and Ricky Miller — were already Operations Supervisors in the Operations Division of the Natural Gas Department at the time they applied.[41]  Two others, Richard Baker and Thomas McCann, were Line Superintendents in the Operations Division.[42]  None of the remaining three worked in the Operations Division at the time of their application:  Jeff Gibbs worked as Conduit Crew Supervisor in the Facilities Department;[43] Phillip Roberts was an Electronic Technician in the Mapping / Communications Department;[44] and Joel Perry, like George, was an Engineer II in the Engineering Division.[45]

Huntsville Utilities assembled a panel of four white, male administrators and

---

[37] Doc. no. 11, Statement of Undisputed Facts, ¶ 41.

[38] *Id*. at ¶¶ 49-50.

[39] *Id*. at ¶¶ 50.  *See also* doc. no. 22, Statement of Undisputed Facts, ¶ 3.

[40] Doc. no. 11, Statement of Undisputed Facts, ¶ 50.

[41] *Id*. at ¶ 50.

[42] *Id*.

[43] *See*, *e.g.*, Butler Depo., p. 24, lines 4-6.

[44] Doc. no. 11, Statement of Undisputed Facts, ¶ 50.

[45] *Id*.

charged them with the task of reviewing the applications and selecting finalists for interviews.[46]  Those administrators were:  Jimmie Butler, Gas Department Manager; Gail Weber, Human Resources Director; William Pippin, President and Chief Executive Officer of Huntsville Utilities; and Anthony Owens, Water Department Manager.[47]  In reviewing the applicants' submissions, the panel was guided by the vacancy announcement for the Operations Superintendent position, which listed the following qualification requirements and preferences:

(1)    Education:  High School diploma or equivalent.  Completion of formal apprenticeship program[48] and two years of college preferred.

(2)    Experience:  Extensive work experience in the operation and maintenance of a gas, water or electric transmission and distribution system, as appropriate.  Five (5) years in supervisory or leadership position.  Extensive exposure to emergency / disaster operations.[49]

Jimmie Butler evidently took the lead in reviewing applications, and he

---

[46] *Id*. at ¶ 51; doc. no. 22, Statement of Undisputed Facts, ¶ 1.

[47] Doc. no. 11, Statement of Undisputed Facts, ¶ 51.

[48] The apprenticeship program is voluntary course of formal study for entry-level workers at Huntsville Utilities.  *See* Butler Depo., p. 30, line 8 - p. 31, line 22.  The program is taught by various experienced employees in the Engineering and Operations Divisions.  *See* George Depo., p. 100, line 10 - p. 101, line 14.  "Basically, they would work with different crews, maintenance, main line crews, service line crews, meter shop information. . . . And they would come to [the] engineering [division] and see what we did, and be trained in various aspects of the natural gas department."  *Id*. at p. 101, lines 6-14.

[49] Doc. no. 11, Statement of Undisputed Facts, ¶ 42.

recommended that six of the nine applicants be asked to interview.[50]  William Pippin

and Gail Weber reviewed Butler's conclusions and agreed that all applicants *except*

George, Vanessa Akins, and Phillip Roberts should be granted an interview.[51]

Although the committee did not *compare* George to any other applicants,[52] Butler

testified that George, Akins, and Roberts were all disqualified for the same reasons:

*i.e.*, in the judgment of the selection panel, each had insufficient or no experience in

the operation or maintenance of gas distribution systems; and each lacked the

requisite experience in a leadership or supervisory position.[53]

Of those selected to interview, none were female and none were black,

although David Prichett is a native American.[54]   All interviewees were formally

---

[50] *Id*. at ¶ 52.

[51] *Id*. at ¶ 53.

[52] Doc. no. 22, Statement of Undisputed Facts, ¶ 11.

[53] Butler Depo., p. 22, line 22 - p. 24, line 18.  In this explanation lies a tacit admission that George is *otherwise* qualified under the terms of the vacancy announcement.  With a Bachelor's degree in Civil Engineering, George easily satisfies the educational prerequisite and one of the two preferential educational qualifiers — *i.e.*, she has two years of college credit, but has not completed the formal apprenticeship offered by Huntsville Utilities.  Doc. no. 11, Statement of Undisputed Facts, ¶ 34.  It also appears she is sufficiently well-versed in emergency and disaster operations. After all, she performed significant work on the Natural Gas Department's Emergency Procedures Manual and taught a seminar on emergency procedures, served as the Vice-Chair of the Natural Gas Department's Safety Committee, and is an American Red Cross-certified cardiopulmonary resuscitation (or "CPR") instructor.  *Id*. at ¶¶ 11-14, 35; doc. no. 22, Response to Defendant's Statement of Undisputed Facts, ¶¶ 11-14.

[54] Doc. no. 11, Statement of Undisputed Facts, ¶ 58; doc. no. 22, Statement of Undisputed Facts, ¶¶ 4-5.  *But see* George Aff., ¶ 6 (describing Pritchett as someone who "*looks* . . . to be white / non-African-American") (emphasis supplied).

-12-

scored based on their answers to a standard set of interview questions that touched on relevant job experience and knowledge, education and training, communication skills, job performance history, disciplinary records, and leadership.[55]   Prichett received the highest score, and was awarded the promotion to Operations Superintendent on September 11, 2004.[56]

As stated previously, Prichett was promoted from his position as Operations Supervisor in the Operations Division; however, in the course of his career with Huntsville Utilities (spanning more than twenty-six years), he has held a variety of posts within the Operations Division, including Crewman, Pipefitter, and Crew Leader.[57]   The parties agree that Prichett is at least minimally qualified for the Operations Superintendent position.[58]   He has a high school diploma; and, while he evidently did not attend college, he did complete the three-year formal apprenticeship program offered by Huntsville Utilities.[59]   Prichett also has twenty years of supervisory experience in the Operations Division, including experience completing

---

[55] Doc. no. 11, Statement of Undisputed Facts, ¶ 56.

[56] *Id*. at ¶¶ 57-58.

[57] *Id*. at ¶¶ 60-61.

[58] *Id*. at ¶ 69.

[59] *Id*. at ¶¶ 63, 68.   "A college degree is preferred for candidates for the Operations Superintendent position because the job requires writing skills to complete evaluations and reports." Doc. no. 22, Statement of Undisputed Facts, ¶ 7.   "David Prichett's writing skills were adequate." *Id*. at ¶ 8.

performance appraisals, and he has been involved with emergency operations procedures.[60]   His extracurricular experience is in many ways comparable to George's: like her, he has served on the Total Quality Management Committee and the Safety Committee,[61] and has taught classes for the apprenticeship program.[62]

George thinks the selection committee's determination that she was less qualified than Prichett for the Operations Superintendent position was misguided.[63] Indeed, her contention is that Prichett was selected over her not because he is the better person for the job, but because the better person for the job happens to be a black woman.[64]

## III.  DISCUSSION OF LAW

George's claims are premised upon the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment,

---

[60] Doc. no. 11, Statement of Undisputed Facts, ¶¶ 61, 62, 67.

[61] *Id*. at ¶¶ 12, 36, 65.  *See also id*. at ¶¶ 36-37 (indicating that George also served on the Record Retention Committee and the Volunteer Council); *id*. at ¶ 65 (indicating that Prichett also served on the Plastic Pipe Committee, the Apprenticeship Committee, and the Total Quality Management Steering Committee).

[62] *Id*. at ¶¶ 35, 64.  *See also id*. at ¶ 66 ("David Prichett is a two-term elected councilmember of the New Hope City Council.").

[63] George Depo., p. 150, lines 1-23.

[64] *Id*. at p. 164, lines 8-19.

because of such individual's *race*, *color*, religion, *sex*, or national origin." 42 U.S.C.

§ 2000e-2(a)(1) (emphasis supplied).[65]   Section 1981 provides, in part, that "all

persons within the jurisdiction of the United States shall have the same right in every

State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."

42 U.S.C. § 1981(a).[66]  The term "make and enforce contracts" is defined to include,

among other things, "the making, performance, *modification*, and termination of

contracts," including employment contracts.   42 U.S.C. § 1981(b) (emphasis

supplied).   Taken together, these statutes operate to preclude an employer from

intentionally failing to promote an individual because of that person's race and/or sex.

*See*, *e.g.*, *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 768 (11th Cir.

2005); *Wilson v. B/E Aerospace*, *Inc*., 376 F.3d 1079, 1089 (11th Cir. 2004);

---

[65] The full text of this keystone provision of the Civil Rights Act of 1964, as amended, reads as follows:

It shall be an unlawful employment practice for an employer—
  **(1)**  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin; or
  **(2)**  to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, *because of* such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a) (emphasis supplied).

[66] Subsection (c) makes clear that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."  42 U.S.C. § 1981(c).

-15-

*Goodgame v. American Cast Iron Pipe Co.*, 75 F.3d 1516, 1518 (11th Cir. 1996).

Of course, actually proving that an employer relied upon one or both of these illegitimate factors in rejecting a request to be promoted — *i.e.*, "proving that intentional discrimination motivated the employer," *Wilson*, 376 F.3d at 1088 — is rarely a straightforward undertaking.

> Frequently, acts of discrimination may be hidden or subtle; an employer who intentionally discriminates is unlikely to leave a written record of his illegal motive, and may not tell anyone about it. . . . Because of these realities, plaintiffs are often obliged to build their cases entirely around circumstantial evidence. The unique proof problems that accompany discrimination cases are the genesis of the unique solutions that the Supreme Court has devised for those cases in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973),] and its progeny.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997). Below, the court evaluates the evidence in light of the proof paradigm announced in *McDonnell Douglas*.

## A.    George's *Prima Facie* Case

Where, as here, there is no direct evidence of discrimination, the plaintiff bears the initial burden of establishing a *prima facie* case of an employer's intent to discriminate. *E.g.*, *Vessels*, 408 F.3d at 767 (citing *McDonnell Douglas*, 411 U.S. at 802). "Establishment of the prima facie case in effect creates a *presumption* that the employer unlawfully discriminated against the employee." *Texas Department of*

-16-

*Community Affairs v. Burdine*, 450 U.S. 248, 254 (1973) (emphasis supplied). "The

effect of the presumption of discrimination created by establishment of the prima

facie case is to shift to the employer the burden of producing legitimate, non-

discriminatory reasons for the challenged employment action." *Combs*, 106 F.3d at

1528 (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254).  If a

defendant carries its burden of producing "admissible evidence which would allow

the trier of fact rationally to conclude that the employment decision had not been

motivated by discriminatory animus," *Burdine*, 450 U.S. at 257, then the "rebuttable

presumption" of discrimination created by the demonstration of a *prima facie* case[67]

is refuted, "drops from the case," and "the factual inquiry proceeds to a new level of

specificity." *Id.* at 255 & n.10.

     In the context of a failure to promote claim, the plaintiff must establish the

following four elements in order to make out a *prima facie* case:[68]   (1) she is a

---

[67]*See Burdine*, 450 U.S. at 254 n.7 (explaining that, in the *McDonnell Douglas* context, the phrase "*prima facie* case" is used to "denote the establishment of a legally mandatory, rebuttable presumption [of discrimination]").

[68] The Eleventh Circuit has long recognized that when "a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical." *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985). *See also*, *e.g.*, *Brown v. American Honda Motor Co.*, *Inc.*, 939 F.2d 946, 949 (11th Cir. 1991) ("Section 1981 requires proof of *intentional* discrimination. . . . The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases.") (citations omitted) (emphasis in original); *Palmer v. District Board of Trustees of St. Petersburg Junior College*, 748 F.2d 595, 596 n.2 (11th Cir. 1984) (same).  Accordingly, the court will "explicitly address the Title VII claim with the understanding

member of a protected class; (2) she applied for, and was qualified to fill, a position for which the defendant was accepting applications; (3) despite her qualifications, she was rejected for the position; and (4) after her rejection, the employer *either* kept the position open, *or* filled it with a person outside plaintiff's protected class. *See*, *e.g.*, *Vessels*, 408 F.3d at 768; *Walker v. Mortham*, 158 F.3d 1177, 1179 n.2, 1185-93 (11th Cir. 1998) (explaining that a plaintiff need not introduce evidence of the relative qualifications of the person promoted instead of plaintiff as part of her *prima facie* case for failure to promote).

The leading argument advanced by Huntsville Utilities in favor of summary judgment is that George has failed to establish the second element of the *prima facie* case — *i.e.*, that she was qualified for the Operations Superintendent position.[69]  In particular, Huntsville Utilities asserts that George lacks "[e]xtensive work experience in the operation and maintenance of a gas . . . distribution system," and "[f]ive (5) years in [a] supervisory or leadership position," as required by the vacancy announcement.[70]  George counters this argument by assailing both components of the experience requirement as subjective in nature.   As support, she points to the

---

that the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

[69] Huntsville Utilities does not contest George's ability to establish the remaining elements of the *prima facie* case.  *See* doc. no. 22, p. 16.

[70] Doc. no. 11, Statement of Undisputed Facts, ¶ 42.

deposition testimony of selection committee member Gail Weber, who volunteered that the term "extensive experience" is "rather subjective," but added, "certainly it would be more than a little."[71]   George also complains that the stipulation of five years in a supervisory or leadership position is subjective by analogizing to a recent Eleventh Circuit case in which the court deemed a preference for a certain "leadership style" a subjective hiring criterion.  *See Vessels*, 408 F.3d at 768 & n.4.

The point of all this is that George believes she is not required to satisfy Huntsville Utilities's subjective qualification requirements in order to establish a *prima facie* case.  A superficial reading of the Eleventh Circuit's opinion in *Vessels* suggests she is correct.  There, the court refused to require the plaintiff-employee to prove that he possessed "the leadership style that [his employer] preferred" to satisfy the qualification prong of a *prima facie* case.  *See id*. at 768-69.  As the three-judge panel deciding the case saw it,

> subjective evaluations *play no part* in the plaintiff's prima facie case. Rather, they are properly articulated as part of the employer's burden to produce a legitimate race-neutral basis for its decision, then subsequently evaluated as part of the court's pretext inquiry.

*Id*. at 769 (citing, *e.g.*, *Lynn v. Regents of the University of California*, 656 F.2d 1337, 1344-45 (9th Cir. 1981)).  Huntsville Utilities does not attempt to quibble with the

---

[71] Weber Depo., p. 16, lines 11-18.

substantive merit of the rule embraced by the *Vessels* panel.  Instead, defendant argues that the rule is irreconcilable with the statement of law contained within a much earlier Eleventh Circuit panel opinion, *Hill v. Seaboard Coast Line Railroad Co.*, 885 F.2d 804 (11th Cir. 1989), and therefore must be disregarded under the prior panel precedent rule.  *See*, *e.g.*, *Morrison v. Amway Corp.*, 323 F.3d 920, 929 (11th Cir. 2003) ("A prior panel decision of this Court is binding on subsequent panels and can be overturned only by the Court sitting en banc.").[72]

In *Hill*, the Eleventh Circuit considered the impact of an employer's use of subjective hiring criteria on the employees' obligation to establish qualification as a part of the *prima facie* showing of discrimination.  After a bench trial below, the district court found that the employees in the case were not qualified for the position they sought "because they did not possess the required intelligence, aptitude, and written and verbal communication skills."  *Hill*, 885 F.2d at 808.  On appeal, the employees urged "that a district court may only consider *objective* criteria in evaluating whether a plaintiff has established a prima facie case under *McDonnell Douglas*."  *Id.* (emphasis supplied).  In so doing, the employees put much stock in the

---

[72] The "firmly established" rule of the Eleventh Circuit is that "each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court."  *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993).  *See also*, *e.g.*, *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (*en banc*) ("Under our prior panel precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong.").

*Lynn* case from the Ninth Circuit that was later to be cited approvingly by the *Vessels*

court.  The *Hill* panel reviewed *Lynn*, but ultimately decided that it did *not* mesh well

with this Circuit's jurisprudence:

> Although this circuit has viewed the use of subjective factors in employment decisions with suspicion, it has not adopted the *Lynn* analysis. . . . We have not held that a plaintiff need meet only the employer's objective criteria in order to establish [the qualification] prong of a prima facie case.

*Hill*, 885 F.2d at 809.  Instead, the *Hill* panel interpreted binding authority as

requiring proof of subjective qualifications in all cases except (1) those in which "the

employer depended on *only* subjective criteria in making its decision, not a mix of

objective and subjective criteria," *id*. (emphasis in original), *or* (2) where the

subjective requirement at issue was "something akin to 'likability' or 'loyalty,'" *id*.

— in other words, "so subjective as to be incapable of objective evaluation."  *Id*. at

n.7.  Finding that neither of these exceptions applied to the facts before it, the *Hill*

panel affirmed the district court's refusal to dispense with proof of subjective

qualifications, holding that "it was within the district court's role and capabilities to

assess whether the subjective employment qualification was bona fide and whether

an employer's testimony that the plaintiff did not possess the qualification was

credible."  *Id*.

    Though few subsequent cases actually cite to the *Hill* holding, the substance

of that rationale has silently become enshrined in this Circuit's case law.  *See*, *e.g.*,

*Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998)

(holding that qualification requirements that "are incapable of objective evaluation

. . . . cannot be relied upon by an employer seeking to defeat the plaintiff's prima facie

case by showing that the plaintiff is less qualified than the applicant chosen for the

promotion").  In fact, when placed in context, the *Vessels* decision can be read to

draw upon *Hill* rather than blatantly contradicting it.  The three judges deciding

*Vessels* made clear from the outset that the employer's stated preference for a certain

"leadership style" was "*entirely* subjective." *Vessels*, 408 F.3d at 768 n.4 (emphasis

supplied).  Put in the language of *Hill*, "the employer depended on *only* subjective

criteria in making its decision, not a mix of objective and subjective criteria." *Hill*,

885 F.2d at 809 (emphasis in original).  Moreover, the *Vessels* panel expressed

concerns that possession of a certain, preferred "leadership style" was not susceptible

to proof by "evidence that is *objectively verifiable* and either easily obtainable or

within the plaintiff's possession." *Vessels*, 408 F.3d at 769 (emphasis in original).

Given both of these factors, it is not surprising that the *Vessels* panel refused to

consider the subjective "leadership style" criterion at issue in the *prima facie* stage

of that case.  In fact, the operative facts of *Vessels* were the exact opposite of *Hill*, and

both of the exceptions that were deemed inapplicable in *Hill* were quite apposite in

-22-

*Vessels*.     True, the articulation of the holding in *Vessels* was quite broad —

"subjective evaluations play no part in the plaintiff's prima facie case," *id*. — but

> [i]t is a maxim, not to be disregarded, that general expressions, in every
> opinion, are to be taken in connection with the case in which those
> expressions are used.  If they go beyond the case, they may be respected,
> but ought not to control the judgment in a subsequent suit, when the
> very point is presented for decision.

*Cohens v. Virginia*, 6 Wheat (19 U.S.) 264, 399 (1821).  In short, the court concludes

that the *Vessels* holding does not retread ground already covered by *Hill* and,

therefore, need not be set aside under the prior panel precedent rule.[73]

Moreover, *Vessels* is distinguishable from the present case.  Here, subjective

qualifications comprised only a part of the hiring criteria; and, even though the twin

experience requirements are somewhat open to interpretation, they are not "so

subjective as to be incapable of objective evaluation."  *Hill*, 885 F.2d at 809 n.7.  *See*

*also Carter*, 132 F.3d at 644.  With that in mind, this court cannot excuse George

from proving, as a part of her *prima facie* case, that she meets Huntsville Utilities's

subjective qualifications.

The first of those qualifications is "[e]xtensive work experience in the

operation and maintenance of a gas . . . distribution system."[74]  According to selection

---

[73] *See supra* n.72.

[74] Doc. no. 11, Statement of Undisputed Facts, ¶ 42.

committee member Gail Weber, the adjective "extensive" means "more than a little."[75]   Specifically, Weber testified that he "would certainly phrase [the requirement of *extensive experience*] in terms of years.  And extensive also not in terms of just time, but also the breadth of . . . responsibilities and activities."[76]  To the extent that compliance with this subjective requirement can be objectively evaluated, *see Carter*, 132 F.3d at 644, the court is satisfied that George meets it.  At the time of her application for the Operation Superintendent position, George had worked as an Engineer and/or Load Controller with the Natural Gas Department for approximately nine years.[77]  As her attorney aptly summarized, George "taught classes on natural gas supply control, provided technical direction with respect to pipeline installation, monitored gas flow and distribution, responded to and investigated problems in the field for transducers or turbines, and assisted with maintenance of turbine meters."[78]  The result of this experience is, in the words of George's supervisors, an "excellent grasp of total gas supply function,"[79] and "complete working knowledge of gas department policies."[80]  In sum, a reasonable

---

[75] Weber Depo., p. 16, line 18.

[76] *Id*. at p. 16, line 23 - p. 17, line 3.

[77] Doc. no. 11, Statement of Undisputed Facts, ¶¶ 1, 4.

[78] Doc. no. 22, p. 20 (citing George Aff., ¶¶ 7, 10, 12, 20, 21, 22, 24).

[79] Doc. no. 18, Ex. 8 (capitalization eliminated).

[80] *Id*. at Ex. 6 (capitalization eliminated).

jury certainly could conclude that George had "[e]xtensive work experience in the operation and maintenance of a gas . . . distribution system."[81]   The second subjective qualification requirement is "[f]ive (5) years in [a] supervisory *or* leadership position."[82]   Obviously, what makes this requirement subjective is the inherent malleability of words like "supervisory" and "leadership."  The subjective nature of these adjectives is ameliorated to some extent by their modification of the noun "position."   Selection committee member William Pippin shed light on this requirement, testifying that his "definition of leadership experience is when you are leading a crew, three or more men. . . . You are directing the resources to complete a job."[83]  Furthermore, as Pippin sees it, "a supervisor has performance appraisal requirements [*sic*] of the people that he supervises or leads."[84]

George has held three positions at Huntsville Utilities:  Engineer I; Load

---

[81] Doc. no. 11, Statement of Undisputed Facts, ¶ 42.  Counsel for Huntsville Utilities protests that "no reasonable person would conclude that an individual who has never worked in the Operations Division has the 'extensive experience' required to lead this division."  Doc. no. 23, p. 9.  That may be true, but the job announcement did not phrase the "extensive experience" requirement in such terms.  That is, the successful candidate was not required to possess "extensive experience in the Operations Division."  To the contrary, the announcement merely required "[e]xtensive experience in the operation and maintenance of a gas . . . distribution system," presumably regardless of how that experience was obtained.  *See* doc. no. 11, Statement of Undisputed Facts, ¶ 42.

[82] Doc. no. 11, Statement of Undisputed Facts, ¶ 42 (emphasis supplied).

[83] Deposition of William Pippin ("Pippin Depo."), p. 10, lines 19-23.

[84] *Id*. at p. 11, lines 4-6.

Controller; and Engineer II.[85]   She admits that she did not "supervise" other employees while working as an Engineer I,[86] nor has she *ever* possessed the authority to hire or fire employees, grant pay raises, complete performance appraisals, issue reprimands, or otherwise discipline subordinate workers.[87]  Aside from her part-time service on several Huntsville Utilities committees, George's sole claim to experience in a supervisory or leadership *position* is related to her work on the after-hours load control rotation.[88]  George is not involved in *selecting* employees to serve on the load control rotation, or in mediating scheduling conflicts if and when they arise.[89]  On the other hand, the position description for Load Controller indicates that the incumbent "*instructs* and *oversees* on-call personnel regarding *all decisions* to be made *involving SCADA control*."[90]  George — who has served as Load Controller for more than five years — testified that she fulfills this responsibility by staying "pretty aware of what everybody [on load control rotation] is doing" with respect to after-hours SCADA

---

[85] Doc. no. 11, Statement of Undisputed Facts, ¶¶ 4, 18, 31; doc. no. 22, Response to Defendant's Statement of Undisputed Facts, ¶ 31.

[86] Doc. no. 11, Statement of Undisputed Facts, ¶ 10.

[87] *Id.* at ¶ 22-23.  *See also id.* at ¶ 33.

[88] George Depo., p. 77, lines 8-10 ("The only people I supervise are the people that are on-call after hours and over the weekends.").

[89] Doc. no. 11, Statement of Undisputed Facts, ¶ 20; George Aff., ¶ 19.

[90] Affidavit of Jimmie Butler ("Butler Aff."), Ex. 3 (Load Controller Position Description), p. 1 (emphasis supplied).  *See also* George Aff., ¶ 21.

monitoring.[91]  And while Jimmie Butler attested that "George . . . does not [actually] supervise those employees who rotate the on-call rotation for load controller,"[92] George has twice been recognized in performance evaluations for her "excellent *instruction* and *direction* of those [persons who] assist with monitoring SCADA and load control."[93]

Thus, viewing the facts in the light most favorable to George, this evidence appears to indicate that she met Pippin's definition of *leadership* experience:  she spent time "leading a crew" and "direct[ed] the resources to complete a job,"[94] *i.e.*, SCADA monitoring, for five years.  Satisfaction of the *leadership* prong of the experience requirement renders compliance with the alternative *supervisory* prong superfluous.[95]

## B.    Huntsville Utilities's Rebuttal

George having made out a *prima facie* case, the burden shifts to Huntsville Utilities "to articulate a non-discriminatory reason for failing to promote [her]." *Vessels*, 408 F.3d at 769 (citing *Burdine*, 450 U.S. at 254).  *See also*, *e.g.*, *U.S. Postal*

---

[91] George Depo., p. 78, lines 10-11.

[92] Butler Aff., ¶ 6.

[93] Doc. no. 18, Ex. 9 (some capitalization eliminated) (emphasis supplied).  *See also id.* at Ex. 8 ("Excellent effort in training and direction in [*sic*] those that [*sic*] assist with SCADA.") (some capitalization eliminated).

[94] Pippin Depo., p. 10, lines 22-23.

[95] *See* doc. no. 11, Statement of Undisputed Facts, ¶ 42.

*Service Board of Governors v. Aikens*, 460 U.S. 711, 714 (1983) ("[T]he defendant must produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.") (internal quotations and citation omitted). The employer's burden at this second stage of analysis "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).[96]

Huntsville Utilities has produced testimony that George was not selected for the Operations Superintendent position for two reasons: because she was considered unqualified in terms of experience; and also because David Prichett was viewed as more qualified in that respect.[97] These are legitimate, non-discriminatory reasons for failing to promote George to the Operations Superintendent post. *See, e.g., International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977) (noting that "an absolute or relative lack of qualifications" is one of the "most

---

[96] "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55 (citation and footnote omitted)). Indeed, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257.

[97] *See, e.g.*, Weber Depo., p. 18, lines 7-16; *id.* at p. 24, lines 7-21; Butler Depo., p. 34, line 12 - p. 35, line 21; Pippin Depo., p. 26, lines 11-15.

common reasons on which an employer might rely to reject a job applicant"); *Combs*,

106 F.3d at 1538-39 (holding that superior experience is a legitimate, non-

discriminatory justification for selecting one candidate over another).  Accordingly,

Huntsville Utilities has carried its burden of rebutting the presumption of

discrimination created by George's demonstration of a *prima facie* case.[98]

## C.    The Pretext Inquiry

In the final step of the analytical process, the burden shifts back to the plaintiff

to "come forward with evidence, including the previously produced evidence

establishing the prima facie case, sufficient to permit a reasonable factfinder to

---

[98] The court rejects George's contention that "[r]elative qualifications cannot serve as a legitimate non-discriminatory reason for the failure to promote if the Defendant did not actually compare the Plaintiff with Mr. Prichett."  Doc. no. 22, p. 22.  The rule to which George refers was developed for cases that are factually distinguishable to this one.  Indeed, each of the cases cited by George involved a situation in which the employer failed to even cursorily evaluate the applicant for the post, and then later claimed, *ex post facto*, that the applicant was not selected because he or she was not as qualified as the selectee.  *See, e.g.*, *I.M.P.A.C.T. v. Firestone*, 893 F.2d 1189, 1193-95 (11th Cir. 1990); *Joshi v. Florida State University Health Center*, 763 F.2d 1227, 1235 (11th Cir. 1985).  Here, in contrast, George received an individualized assessment in response to her application, but was disqualified (allegedly for lack of experience) before interviews even commenced.  Therefore, while she may not have been *directly* compared to the eventual selectee, a decision was nevertheless made that Prichett was sufficiently qualified to receive an interview, whereas George was not.  Moreover, the decisionmakers would still have been aware of the alleged qualification disparity when they finally selected Prichett for the Operations Superintendent position.  In such a situation, it is perfectly permissible for Huntsville Utilities to assert that George was not selected both because she was viewed as unqualified, and, because Prichett was viewed as more qualified.  *Cf. Hill v. Seaboard Coastline Railroad Co.*, 767 F.2d 771, 774 (11th Cir. 1985) ("Of course, failure to promote a plaintiff because the person actually promoted was more qualified is a nondiscriminatory reason, but the articulation of that reason must include the fact that the decision-maker knew that the promoted individual's qualifications were superior at the time the decision was made.") (citing *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 626 (11th Cir. 1983)).  *See also generally Walker*, 158 F.3d at 1181 n.8 (discussing *Hill* and *Eastland*).

conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely a pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804).  *See also Wilson*, 376 F.3d at 1088 ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Quarreling with that reason is not sufficient.") (internal citation omitted).  The plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Combs*, 106 F.3d at 1538 (internal quotations and citation omitted).  If a plaintiff demonstrates pretext, she "is entitled to survive summary judgment," *id.* at 1529, *except* in the rare case where, notwithstanding the evidence of pretext, "no rational factfinder could conclude that the action was discriminatory."  *Reeves*, 530 U.S. at 134-35.  *See also Brooks v. Jefferson County Commission*, 446 F.3d 1160, 1163 (11th Cir. 2006).  In any event, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves*, 530 U.S. at 143.  That burden is particularly weighty in cases like this, where the plaintiff's only argument concerning pretext hinges on the allegation that she was

more qualified for the position at issue than the individual who ultimately was selected in her stead. The Eleventh Circuit has explained that, "[i]n the context of a promotion: 'a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [applicant] who received the promotion he coveted.'" *Brooks*, 446 F.3d at 1163 (quoting *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000)). Instead, "[a] plaintiff must show that the disparities between the successful applicant's and [his] own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id.* (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004)). *See also Ash v. Tyson Foods*, 546 U.S. 454, 457 (2006).

George argues she is more qualified than Prichett for three reasons. First, she notes that she possesses a college degree, but Prichett did not attend college at all.[99] This is largely irrelevant. Neither the job announcement nor the position description for the Operations Superintendent post *require* a college degree; only a high school diploma is mandated.[100] True, two years of college is listed as a preferential requirement, but so also is completion of the employer's formal apprenticeship

---

[99] Doc. no. 22, p. 24.
[100] Doc. no. 11, Statement of Undisputed Facts, ¶ 42; George Depo., Ex. 5 (Operations Superintendent Position Description).

program.[101]  Prichett has completed that program; George has not.[102]  Accordingly,

Prichett and George each satisfied one of the two educational preferences.  Nothing

about this suggests that George was clearly more qualified for the opening than

Prichett.  To the contrary, it appears the two candidates were roughly, equally

qualified in terms of the educational background requirements specified by the

employer.  *Cf. Simms v. Oklahoma*, 161 F.3d 1321, 1330 (10th Cir. 1999) ("When

two candidates are equally qualified in that the both possess the objective

qualifications for the position and neither is clearly better qualified, it is within the

employer's discretion to choose among them so long as the decision is not based on

unlawful criteria.").

George next claims that she "was exposed to more areas, duties and

responsibilities in the natural gas department than Mr. Prichett."[103]  In other words,

George feels she edges out Prichett when it comes to "[e]xtensive work experience

in the operation and maintenance of a . . . gas distribution system."[104]  The court is not

so sure.  As noted above, selection committee member Gail Weber testified that he

"would certainly phrase [the requirement of *extensive* experience] in terms of years.

---

[101] Doc. no. 11, Statement of Undisputed Facts, ¶ 42; George Depo., Ex. 5 (Operations Superintendent Position Description).

[102] Doc. no. 11, Statement of Undisputed Facts, ¶¶ 34, 63.

[103] Doc. no. 22, p. 25.

[104] Doc. no. 11, Statement of Undisputed Facts, ¶ 42.

And extensive also not in terms of just time, but also the breadth of . . . responsibilities and activities."[105]   There can be little doubt that George is well-versed in load control principles, and has a firm handle on the operation of a gas distribution system.  She also has experience in interacting with Operations Division employees.

By that same token, however, Prichett spent twenty-six years working in multiple capacities in the Operations Division before applying to be Operations Superintendent.[106]  He served as Crewman, Pipefitter, Crew Leader, and Operations Supervisor.[107]  In those roles, Prichett performed all tasks necessary to install service lines and main lines, and repaired gas leaks in the field.[108]  For the twenty years immediately prior to his application for Operations Superintendent, Prichett occupied various supervisory positions.[109]  He also has been exposed to emergency operations, including work repairing gas leaks in the wake of a major tornado.[110]  In short, Prichett claims to "have done everything in gas operations that there is to do."[111]

Beyond his day-to-day duties, Prichett served on a number of Huntsville

---

[105] Weber Depo., p. 16, line 23 - p. 17, line 3.

[106] Doc. no. 11, Statement of Undisputed Facts, ¶ 60.

[107] *Id*. at ¶ 61.

[108] Deposition of David Prichett ("Prichett Depo."), p. 8, lines 20-23; *id*. at p. 9, lines 10-11.

[109] Doc. no. 11, Statement of Undisputed Facts, ¶ 62.

[110] *Id*. at ¶ 67.

[111] Prichett Depo., p. 29, lines 6-7.

Utilities committees,[112] and taught classes in the apprenticeship program, including seminars on "tapping" and "stopping" techniques, natural gas service set-up, backhoe operations, plastic pipe fusion, and electrofusion.[113] Gail Weber testified that Prichett was selected due to "[h]is years and breadth of experience. He had extensive not only technical and skills — technical knowledge and skills, hands-on skills, but he also had extensive supervisory experience."[114]

Even viewing the evidence in the light most favorable to George, Prichett at the very least possesses *as much* experience with natural gas systems as she does. Therefore, George "did not meet her burden under *Cooper* to show that the disparities between her [experiential] qualifications and [Prichett's] were so severe that *no* reasonable person could have chosen [Prichett] over her." *Brooks*, 446 F.3d at 1163 (emphasis in original).

Finally, George touts her higher exemption status as evidence that she is better suited to be Operations Superintendent than Prichett: *i.e.*, George is an Engineer II, Grade 5, whereas Prichett was a Supervisor, Grade 4 at the time he applied for the opening.[115] This contention is easily put to rest. Neither the job announcement nor

---

[112] Doc. no. 11, Statement of Undisputed Facts, ¶ 65.

[113] Prichett Depo., p. 17, lines 10-14. *See also* doc. no. 11, Statement of Undisputed Facts, ¶ 63.

[114] Weber Depo., p. 18, lines 12-16. *See also id.* at p. 24, lines 7-21.

[115] Doc. no. 22, p. 25.

-34-

the position description for Operations Superintendent listed a preference or requirement of any particular exempt status or grade level, and George makes no attempt to explain why her higher exemption status should render her inherently more qualified for the opening. In the absence of such an explanation, the court declines the invitation to accord her higher exemption status dispositive weight.

Based on a complete review of the record, the court concludes that George has failed to "show that the disparities between the successful applicant's and her own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over [her].'" *Brooks*, 446 F.3d at 1163 (quoting *Cooper*, 390 F.3d at 732). Thus, Huntsville Utilities is due summary judgment. *See, e.g., Grigsby v. Reynolds Metal Company*, 821 F.2d 590, 597 (11th Cir. 1987) ("Where the defendant's justification evidence completely overcomes any inference to be drawn from the evidence submitted by the plaintiff, the district court may properly acknowledge that fact and award summary judgment to the employer.").

## IV. CONCLUSION AND ORDER

For all of the foregoing reasons, Huntsville Utilities's motion for summary judgment is due to be, and it hereby is, GRANTED. All claims in Marteace George's complaint are DISMISSED with prejudice, and costs are taxed to her. The Clerk is

directed to close this file.

DONE and ORDERED this 26th day of November, 2007.

_____
United States District Judge